## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **COREY ATCHISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-CV-286-TCK-SH** |
| | ) | |
| **CITY OF TULSA, OKLAHOMA,** | ) | |
| **ROBERT JACKSON, GARY MEEK,** | ) | |
| **KEN MAKINSON, FRED PARKE,** | ) | |
| **JACK PUTNAM, SCOTT ROGERS,** | ) | |
| **MICHAEL EUBANKS, S.M. IRWIN,** | ) | |
| **HAROLD "BEAR" WILSON, and** | ) | |
| **UNKNOWN OFFICERS;** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION and ORDER

Before the Court are Motions of Defendants to Dismiss Plaintiff's Complaint (Docs. 13, 30, 31, 32, 40, 52, 53, 54, & 59). Plaintiff filed Responses to the Motions to Dismiss (Docs. 17, 62, 60, 65, 64, 63, 66, 61 & 67). Defendants filed Replies to each Response (Docs. 20, 69, 75, 70, 73, 68, 71, 74 & 72)**.**

Plaintiff alleges that officers of the Tulsa Police Department, the defendants Robert Jackson, Gary Meek, Ken Makinson, Fred Parke, Jack Putnam, Scott Rogers, Michael Eubanks, S.M. Irwin, Harold "Bear" Wilson, and others (collectively "Defendants"), "framed Plaintiff for a 1990 murder after Plaintiff's only connection to the crime was having the decency to stop his car when he saw that someone had been shot, try to help, and urge passersby to call 911." (Doc. 67 * 8) and (Doc. 57, Corrected Complaint ("Complaint")).[1]  Plaintiff alleges that after Defendants

---

[1] Plaintiff inadvertently omitted Defendant Harold "Bear" Wilson in the original Complaint. (Doc. 2). Plaintiff did, however, refer to Defendant Wilson throughout the body of the Complaint. On

framed him, he was sentenced to life in prison, where he spent 28 years wrongfully convicted of murder before he was exonerated. There was no physical evidence or motive tying Plaintiff to this crime, nor was a weapon or money found on him at the scene of this robbery/shooting. Plaintiff did not match eyewitness descriptions of the shooter. The Complaint details the alleged conspiracy, wherein Defendants failed to follow leads and buried evidence about the true murderer, choosing instead to coerce teenagers to falsely identify Plaintiff.

Plaintiff brings several claims against the Defendants including § 1983 claims for violations of his due process rights, deprivation of liberty without probable cause, conspiracy to deprive him of his constitutional rights, and failure to intervene. Plaintiff also brings state law claims against the Defendants for intentional infliction of emotional distress, malicious prosecution, and state civil conspiracy.

Defendants contend they are entitled to qualified immunity, and that Plaintiff has not adequately distinguished the factual allegations against each individual officer so as to provide notice.

Plaintiff brings a § 1983 municipal liability claim against the City of Tulsa, Oklahoma ("City") as well as state law claims for respondeat superior and indemnification. Plaintiff's claims include allegations that the City employed a number of unconstitutional law enforcement policies and customs that were a moving force behind the violation of Plaintiff's constitutional rights, as well as the wrongful convictions of several other citizens.

The City argues that Plaintiff's claims against it are procedurally barred by the Oklahoma

---

February 1, 2022, Plaintiff filed an unopposed Motion for Leave to File Corrected Complaint to correct the clerical error, which was granted on February 7, 2022. (Doc. 56). The Corrected Complaint was filed on February 7, 2022. (Doc. 57).

Governmental Tort Claims Act ("OGTCA") and that the Defendants are not entitled to indemnification under the facts alleged in the complaint.[2]

## I. Background

In 161 paragraphs, Plaintiff's Complaint outlines how he believes Defendants' misconduct violated his constitutional and state-law rights and caused his wrongful conviction for a crime he did not commit.

The Complaint alleges that despite his innocence, Plaintiff was wrongfully convicted of the 1990 shooting murder of James Lane and sentenced to life in prison. (Doc.57, ¶ 1). He spent 28 years unjustly imprisoned before he was finally exonerated. There was never any motive, physical evidence, or inculpatory statement connecting Plaintiff to Lane's murder. *Id*. at ¶ 2. Instead, Plaintiff's arrest, prosecution, and conviction were based on shocking misconduct by the Defendants. *Id*. at ¶ 3. Specifically, Defendants built an entirely false case against Plaintiff based on fabricated police reports and suppressed exculpatory evidence which Plaintiff could have used to defend himself against the false charges. *Id*. at ¶¶ 5. Defendants also coerced false statements naming Plaintiff as the assailant from several individuals, including three teenagers, each of whom have since recanted their statements and explained that it was a result of police coercion. *Id.* at ¶ 6.

The shooting took place during the early morning hours of August 3, 1990, when James Lane fought with a group of men after Lane had pulled a large amount of cash out of his sock to purchase drugs. *Id*. at ¶¶ 17-18. One of the men involved in the fight fatally shot and robbed Lane.

---

[2] Defendants also each "adopt and incorporate" the City's Motion to Dismiss and Reply Brief. (Docs. 17 & 20).

*Id*. at ¶¶ 18-19. Plaintiff had nothing to do with this shooting. *Id*. at ¶ 20. His only connection to the case was that when he heard the gunshot, he parked his car, approached Lane, and tried to help, asking residents in the area to call for assistance. *Id*. at ¶¶ 22-23. At the time, Plaintiff's car had three passengers—Plaintiff's friends Ben King, Marquis Alexander, and Mareo Johnson. *Id*. at ¶ 22. Plaintiff, King, Alexander, and Johnson stayed with Lane until police arrived. *Id.* at ¶ 23.

### A. Defendants' Initial Investigation

Within hours of the shooting, officers conducted a neighborhood canvas and learned that there were at least three eyewitnesses to the shooting: Stephenne Jacob, Lynette Williams, and Lisa McClish. *Id*. at ¶ 24. Defendants Putnam, Rogers, Eubanks, and Irwin also learned that a 16-year-old boy named Doane Thomas had heard gunshots and ducked into bushes near the shooting, seeking cover. *Id.* at ¶ 25. Thomas did not see who shot Lane, and he waited for a few minutes to pass before leaving the cover of bushes. *Id.* When he exited the bushes, he saw Plaintiff walk up to Lane and yell for someone to call 911. *Id.*

Defendants Putnam, Rogers, and Irwin questioned and searched Plaintiff, his passengers King, Alexander, and Johnson, and his car at the scene. *Id*. at ¶ 26. Defendants found no evidence implicating any of them in the robbery or shooting. *Id.* Plaintiff explained to the officers that he had nothing to do with the shooting and knew nothing about it. *Id.* at ¶ 27. No arrests were made, and Plaintiff and his friends were permitted to leave. Id. at ¶ 28.

### B. Defendants Fabricate and Suppress Evidence of the True Perpetrator

### 1. The False and Suppressed Lisa McClish Reports

Four days after the shooting, eyewitness Lisa McClish called Defendant Detective Ken Makinson and reported that a Black man named Wayne Jones had shot and robbed Lane. *Id*. at ¶

4

29. At the time of the Lane shooting, Jones was 30 years old, 5'9" and approximately 140 pounds. *Id*. at ¶ 30. This description is consistent with descriptions of the shooter from other eyewitnesses. *Id*. However, it was completely incongruent with Plaintiff, who was 20 years old, 6'2", and weighed 265 pounds. *Id*. at ¶¶ 21, 30. Moreover, Jones had a lengthy criminal history, including convictions for robberies with firearms, and at the time of the shooting, Jones was out of prison and on probation for escape from a penal institution. *Id*. at ¶ 31.

Defendant Makinson created a police report of his interview with McClish recording that McClish identified Wayne Jones as having shot Lane, but this report was never turned over during Plaintiff's criminal proceedings. *Id.* at ¶ 32. Defendants suppressed this report for decades, and it did not resurface until 2018. *Id.* at ¶ 33.

Instead, Defendants created and tendered in discovery a false report by Defendant Mackinson stating that McClish had provided the following information about possible suspects of the Lane shooting: the name Wayne Jones; the name Reginald Patterson; information that Patterson was with Jones when Lane was robbed and shot; the name Andre Green; and Plaintiff's name. *Id.* at ¶ 34. This report did not name Jones as the person who shot Lane, nor did it provide any other information about those named except for their names. *Id.* By creating this false and misleading version of the McClish report, Defendant Makinson, in conspiracy with the other Defendants, ensured that Plaintiff was not aware that Wayne Jones had been identified as an alternative suspect and could not further investigate Jones' involvement in the shooting. *Id.* at ¶ 35.

### 2. The Suppressed "Candyman" Report

On or around November 1, 1990, Defendant Detective Fred Parke received a lead that a

5

possible suspect in this case could be a Black male known by the street name of "Candyman." *Id.* at ¶ 36. Although Defendant Parke created a report documenting his lead regarding "Candyman," Defendants suppressed Parke's report and it was never turned over during Plaintiff's criminal proceedings. *Id.* at ¶¶ 37-38.

### 3. The Falsified and Suppressed Stephenne Jacob Report

Stephenne Jacob witnessed the Lane shooting and was able to provide an eyewitness description of the shooting and the culprit to investigators on the night of the murder. *Id.* at ¶ 39. Like McClish, Jacob described the shooter as 5'8" tall and weighing around 140 pounds—half a foot too short and over 100 pounds too light to be Plaintiff. *Id.* at ¶¶ 21, 30, 40. Moreover, Jacob knew Plaintiff well at the time of the shooting and stated emphatically that Plaintiff was not the shooter. *Id.* at ¶ 40. Defendant Irwin, under the direction of Defendant Eubanks, created a report that purported to set forth Jacob's statement about the shooting, but Jacob has attested that the report contains many fabrications. *Id.* at ¶ 41-42. It is accurate only in the sense that Jacob was indeed a witness to the shooting, but the remainder of the statements attributed to her are false. *Id.* at ¶ 42.

Defendants suppressed even the false Jacob report until the eve of trial. *Id.* at ¶ 43. Defendants also never provided the transcript or audio of Jacob's statement, which would have exculpated Plaintiff because it would have included a description of the shooter which did not match Plaintiff's body type. *Id.* By suppressing Jacob's actual statement, suppressing the transcript and audio of her statements, and fabricating an entirely different statement which they attributed to Jacob, Defendants ensured that Plaintiff was misled about Jacob's actual knowledge about the crime and Plaintiff was not able to rely on Jacob at trial. *Id.*

### 4. The Delayed Leticia Nottingham Report

On November 1, 1990, Defendant Jackson interviewed Leticia Nottingham, who lived in the area where the shooting occurred. *Id.* at ¶ 44. Nottingham reported that from the window of her apartment, she saw the argument that preceded the shooting. *Id.* She got a good look at one of the men arguing with Lane and described him as a Black male in his 30s or 40s, 5'8" or 5'9" and weighing 160 or 170 pounds, muscular and in good shape. *Id*. Again, this description was consistent with other descriptions of the shooter and completely inconsistent with Plaintiff, who was 20 years old, 6'2", and weighed 265 pounds. *Id.* Nottingham told Defendant Jackson about hearing gunfire and seeing Lane lying on the ground. *Id*. at 44-45.

Although Defendant Jackson created a report documenting his interview with Nottingham, Defendants suppressed Jackson's report, and it was not disclosed until the eve of trial. *Id*. at ¶ 46. Coupled with the suppression of the McLish report, Plaintiff had no opportunity to connect Nottingham's description of the shooter with McLish's identification of Wayne Jones as the perpetrator. *Id.* Ultimately, these fabricated and suppressed reports were used to arrest, prosecute, and convict Plaintiff of the Lane murder. *Id*. at ¶ 47.

### C. Defendants Ignore Leads and Frame Plaintiff for the Lane Shooting

Instead of conducting a proper investigation and following the developed leads pointing to alternative suspects, Defendants chose to pin the shooting on Plaintiff. *Id*. at ¶ 48. Defendants Jackson and Meek twice interrogated Plaintiff, but when he truthfully denied having any involvement in the shooting, these Defendants pressured him to confess and falsely told him that his friends had already said he committed the murder. *Id.* at ¶ 49. Plaintiff continued to protest his innocence and was released. *Id.* Frustrated by Plaintiff's truthful denials, Defendants then switched

to pressuring Plaintiff's friends instead. *Id.* at ¶ 50.

On September 7, 1990, Defendant Jackson interrogated then 17-year-old Ben King, one of the passengers in Plaintiff's car on the night of the Lane shooting, without a parent present. *Id*. at ¶ 51. King truthfully denied that he or Plaintiff had any involvement in the shooting. Id. King also reported that he had heard on the streets that an individual named LaCount Washington McLendon had shot Lane. *Id.* Defendants never followed up on this lead. *Id*. at ¶ 52.

### D. Defendants Coerce Witnesses into Falsely Identifying Plaintiff as the Shooter

When Plaintiff would not falsely confess to the murder, Defendants Jackson and Meek coerced several young people into making false statements implicating Plaintiff in the Lane shooting. *Id.* at ¶ 53. These false statements naming Plaintiff as the shooter occurred only because Defendants coerced the three teenagers into falsely claiming that Plaintiff was the shooter. *Id*. at ¶ 72. Like the fabricated and suppressed police reports, these fabricated statements were used to arrest, prosecute, and convict Plaintiff of the Lane murder. *Id*. at ¶ 73.

#### 1. Lynette Williams

Sometime after the Lane shooting, Defendant Officers brought Lynette Williams, who was at the crime scene with Jacob and McClish and witnessed the shooting, to the police station and interrogated her. *Id*. at ¶ 54. At least one or more Defendant Officers pressured Williams to identify Plaintiff as the shooter. *Id*. at ¶ 55. Defendants suppressed their efforts to pressure Williams to identify Plaintiff and only revealed that they had even spoken to Williams on the eve of trial, depriving Plaintiff of crucial impeachment evidence at trial. *Id.* at ¶ 56.

#### 2. Doane Thomas

Doane Thomas was the teenager who hid in the bushes when he heard gunfire. *Id.* at ¶ 57.

8

Months later, on February 8, 1991, Doane Thomas was assaulted by a man named Eric Smith and reported the assault at his high school. *Id*. at ¶ 58. School officials called the police and Thomas was taken to the police station to give a statement about the assault. *Id.* After Thomas gave a statement about the assault, Defendants Jackson and Meek questioned him about whether Plaintiff and an individual named Demacio McClendon were involved in the Lane shooting. *Id*. at ¶ 59. Thomas did not have a parent present for the interview, had a learning disability, and was still shaken up from the assault. *Id*. Thomas truthfully reported to Defendants Jackson and Meek that he had seen Plaintiff at the crime scene only after Lane was shot, and Plaintiff was telling people to call for an ambulance. *Id*. at ¶ 60.

Nevertheless, Defendants Jackson and Meek pressured Thomas to identify Plaintiff as the shooter. *Id*. at ¶ 61. When their pressure did not work, they promised Thomas that Smith would never assault him again. *Id*. Thomas—a scared teenager who was without a parent—caved and gave a false statement that Plaintiff was the shooter and that Demacio McClendon had been with him and had also witnessed Plaintiff commit the shooting, although both of these coerced "admissions" were false. *Id*. at ¶ 62.

### 3. Demacio McClendon

After Thomas's February 8, 1991 interview, Defendants Meek and Jackson instructed police officers go to the school of Demacio McClendon, then 15 years old, and arrest him, although they had no knowledge of him committing any crime. *Id*. at ¶¶ 62-63. Police denied McClendon's request to call his mother, arrested him, and took him to the police station, where he was interrogated by Defendants Meek and Jackson without a parent present. *Id*. at ¶ 63. McClendon truthfully told Defendants Meek and Jackson that he didn't know about the Lane shooting and

wasn't there, but Defendants Meek and Jackson threatened to throw McClendon in jail unless he named Plaintiff as the shooter. *Id.* at ¶ 64. Acquiescing to Defendants' threats, McClendon—a scared teenager who was without a parent—gave a false statement that Plaintiff was with Smith and King when Plaintiff shot Lane. *Id.* at ¶ 65.

**4. Ben King**

Defendants Meek and Jackson instructed police officers, including Defendant Wilson, to pick up Ben King from school and arrest him. *Id.* at ¶ 66. Wilson understood he was picking King up from school so that the child could be interrogated without his parents present. *Id.* at 67. Officers brought King to the station directly from school so he could be interrogated for a second time without a parent present. *Id.* at ¶ 67. Defendant Wilson knew or should've known the coercive interrogation tactics King would be subjected to and knew that such tactics commonly result in fabricated witness statements. *Id.*

Defendants Meek and Jackson interrogated King for hours. *Id.* at ¶ 68. They screamed at King and threatened him with the death penalty and life in prison if he did not give a statement that Plaintiff committed the Lane shooting. *Id.* King tried to leave the interrogation room, but the Defendants would not let him leave until he said that Plaintiff shot Lane. *Id.* For the first few hours, King truthfully told the Defendants that Plaintiff did not shoot Lane. *Id.* Defendants then promised King that he could go home if he implicated Plaintiff in the Lane shooting. *Id.* at ¶ 69. King was scared and believed the detectives' promises that he could go home if he said Plaintiff was the shooter. *Id.* at ¶ 70. After several hours of threats and promises, King give a false statement that Plaintiff had committed the Lane shooting. *Id.*

After King gave his false statement implicating Plaintiff, Defendant Officers arrested him

for first degree murder. *Id.* at ¶ 71. Defendant Officers also arrested King, Johnson, and Marquis Alexander and charged them with first degree murder. *Id.* at ¶ 72.

### E. Plaintiff's Wrongful Conviction and Eventual Exoneration

At the conclusion of Plaintiff's 1991 trial, based on Defendants' fabricated and suppressed evidence, Plaintiff was wrongfully convicted of murder. *Id.* at ¶ 75. He was sentenced to life in prison. *Id.* Absent Defendants' misconduct, Plaintiff would never have been arrested, indicted, prosecuted, or convicted. *Id.* at ¶ 76. At no point in time between 1990 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of Lane's murder. *Id.* Before the trial, Defendants suppressed their fabrication of evidence and all evidence that exonerated Plaintiff. *Id.* at ¶ 77. Defendants used false police reports to cover up their misconduct. *Id.* at ¶ 78. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Plaintiff. *Id.* Defendants also gave false statements to state prosecutors and provided false testimony at Plaintiff's criminal trial. *Id.* at ¶ 79. No inculpatory evidence other than the evidence fabricated by Defendants was introduced at Plaintiff's criminal trial. *Id.* at ¶ 80.

Only 20 years old when his ordeal began, Plaintiff spent the next 28 years of his life imprisoned for a crime that he did not commit. *Id.* at ¶ 84. It was not until Defendants' shocking conspiracy of fabrication of evidence, coercion of witnesses, and suppression of exculpatory evidence came to light that Plaintiff was finally exonerated. *Id.* at ¶ 95. On July 16, 2019, Plaintiff's petition requesting to have his conviction vacated was granted, and his conviction was set aside. *Id.* at ¶ 96.

## II. ANALYSIS

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. 556). In assessing whether a plaintiff states a claim, courts must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the pleading party. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

The dismissal of claims prior to discovery "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

Further, all defendants argue they are entitled to qualified immunity. While district courts may adjudicate qualified immunity claims presented in a motion to dismiss, such claims face a challenging standard because the court must analyze the defendant's conduct by fully crediting the allegations in the complaint and drawing all reasonable inferences therefrom. *Ullery v. Bradley*, 949 F.3d 1282, 1287 (10th Cir. 2020); *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). Accordingly, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal [because] when defendants do assert immunity it is essential to consider facts in addition to those in the complaint." *Rock v. Levinski*, 2013 WL 12329164, at *1 (D.N.M. Oct. 22, 2013) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000)). [3] "Motions based on

---

3. As discussed *supra* at pp.16-18, Defendants have submitted matters outside the pleadings for

qualified immunity typically are better brought under Rule 56 rather than at the 12(b)(6) pleading stage." *Id.*

Plaintiffs bear the burden of overcoming a qualified immunity defense. *Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021). At the motion to dismiss stage, this burden requires a plaintiff to: (1) plead facts demonstrating that the defendant violated a federal constitutional or statutory right, and (2) show that the right was clearly established at the time of the defendant's conduct. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019)).

To meet the first prong, all a plaintiff must do to state a claim under Section 1983 is allege that a person acting under color of state law has deprived him of a federal right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Supreme Court admonishes that this basic pleading requirement of Section 1983 claims is not heightened simply because a defendant asserts a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 594-97 (1998); see also *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (no heightened pleading requirement to refute in qualified immunity; rather, the complaint must need only "meet the minimal standard of notice pleading as articulated by the Court in *Twombly*."). Accordingly, under the first prong for assessing qualified immunity, the complaint need only contain factual allegations that plausibly give rise to an entitlement to relief. *Ullery*, 949 F.3d at 1287 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

This basic pleading requirement "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfullyharmed-me accusation." *Id.* (citing *Iqbal*, 556 U.S. at 678, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In assessing

---

the Court's consideration of this matter.

13

whether plaintiffs state a claim, courts must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the pleading party. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

A plaintiff meets the second element, the clearly established prong, "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts show that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (citation omitted). This requires that the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id*. The analysis is general and does not require an exactly analogous case—it "is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id*. (quoting *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)); see also *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019) (second prong of the qualified immunity analysis is met when it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted ... even though existing precedent does not address similar circumstances.") (citation omitted).

### A. Notice

Defendants move to dismiss Plaintiff's Complaint on that ground that it impermissibly "lumps all Defendants together."  The Court finds, however, Plaintiff's Complaint identifies a limited and well-defined subset of individuals who are alleged to have violated Plaintiff's rights, and it further describes what actions they took. (Doc. 57 ¶¶ 24-73 (Defendants fabricated and suppressed evidence of the true perpetrator); ¶¶ 29-47 (Defendants ignored leads and framed Plaintiff); ¶¶ 48-52 (Defendants coerced witnesses into falsely identifying Plaintiff as the shooter);

14

¶¶ 53- 73); (Defendants conspired with each other by fabricating evidence and withholding exculpatory information) ¶¶ 120-126). That is all that is required at this stage. Contrary to Defendants' argument that Plaintiffs have engaged in impermissible "lumping," it is well established that a complaint does not fail because it refers to the actions of a small number of defendants as a group.

Defendants Jackson, Meek, Makinson, Parke, Putnam, Rogers, Eubanks and Wilson are not entitled to dismissal because the Complaint makes the same allegations against each of them. Instead, the core consideration is notice. *Twombly*, 550 U.S. at 554-55. Thus, district courts in this Circuit have repeatedly refused to dismiss complaints for allegedly improper group pleading. *See, e.g.*, *APMC, Inc. v. Fogarty*, 2008 WL 4279780, at *2 (W.D. Okla. Sept. 12, 2008) (plaintiff meets the pleading standard by identifying specific activities taken within a discrete time frame); *Bledsoe v. Bd. of Cty. Commissioners of Cty. of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D. Kan. 2020) (noting "the Tenth Circuit never has adopted a blanket prohibition against collective allegations" and finding that the collective allegations against a defined group of defendant officers were sufficiently specific to survive a motion to dismiss).

Dismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery. *See, e.g., Birdsong v. Unified Government of Kansas City*, 2014 WL 2216904, at *5 (D. Kan. May 29, 2014) ("[T]o the extent that [defendants] are requesting that Birdsong be required to allege how [defendants] otherwise 'agreed, conspired, and acted in concert to falsely and maliciously prosecute Birdsong, that level of pleading is not required by Rule 8(a)(2). Moreover, it is understandable that Birdsong, prior to discovery, may not have sufficient knowledge or information to provide the specific level

15

of detail requested by [defendants].”). This is particularly true in cases like this one, where much of the alleged misconduct happened outside of Plaintiffs' direct observation. For example, in *Bark v. Chacon*, 2011 WL 188469 (D. Colo. May 18, 2011), the court rejected the defendants' "lumping" challenge on the ground that it would be unfair to require the plaintiff in a search and seizure case to allege which specific defendant committed which specific act in question, holding that all the plaintiff was required to do at the pleading stage was name the officers involved, describe the alleged misconduct, and allege that the officers collectively committed that misconduct. *Id.* at *5.

Just as in *Bark*, Plaintiff in this case has named the officers involved in the investigation, described the misconduct used to secure his wrongful conviction, and alleged that the Defendants collectively committed that misconduct. Without discovery, it is not reasonable to expect, nor does the law require, Plaintiff to identify every specific action each Defendant took. *See, e.g., Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008) (holding complaint which grouped defendants together was sufficient because complaint clearly named defendants who allegedly committed misconduct, which gave defendants fair notice of the grounds on which the plaintiff claimed entitlement to relief.).

Therefore, Plaintiff's allegations in the instant case, which identify the Defendants and then consistently discuss different subgroups of defendants are sufficient— Defendants Jackson, Meek, Makinson, Parke, Putnam, Rogers, Eubanks and Wilson are on adequate notice of the claims against them. This is all that is required at this early stage of litigation.

### B. Defendants' Motion to Dismiss Cannot be Decided on Matters Outside the Pleadings

Despite their characterization, Defendants' motions to dismiss are motions for summary

judgment and are premature. This Court cannot consider evidence outside the operative complaint at the motion to dismiss stage. A Rule 12(b)(6) motion that is based on material outside the pleading is converted to a Rule 56 motion pursuant to Federal Rule of Civil Procedure 12(d). *Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014).

When resolving a motion to dismiss, "a district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claim, and (3) indisputably authentic." *Id*. Courts may also properly rely on matters that they can judicially notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider "matters of which [it] may take judicial notice" in ruling on motions to dismiss). None of these conditions apply here.

In support of their motions, Defendants ask this Court to consider additional documents outside the Plaintiff's Complaint that purportedly establish what happened during the interviews of witnesses; what actions Defendants took during their investigation; and what motivations were behind their actions.

Defendants next contend this Court can take judicial notice of the facts as described in the state-court criminal proceedings. While the Court could take judicial notice that Plaintiff was tried and convicted for the shooting, it can only do so if those facts are not subject to reasonable dispute. *Gee,* 627 F.3d at 1186. As the state court record includes contested facts, including whether witnesses identified Plaintiff as the shooter without any police pressure or coercion, this Court cannot take judicial notice of these documents. *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995); *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (taking judicial notice of documents only to show their contents, not to prove the truth of matters asserted therein). Therefore, Defendants' attempt to challenge Plaintiff's claims based on Defendants' interpretation

17

of the underlying investigation and state-court proceedings in this matter—interpretations which are outside of Plaintiff's Complaint—converts Defendants' motions to ones for summary judgment under Federal Rule 12(d).

### C. Judicial Review Absolving Plaintiff

The City argues that Plaintiff's claims against it are not ripe because Plaintiff has not yet been adjudicated as actually innocent as required under the OGTCA. However, Plaintiff was found actually innocent on July 16, 2019. (Doc. 13-4, Written Order; Ex. A, Transcript of Proceedings on July 16, 2019 ("Transcript of Proceedings")).

The OGTCA allows claims against governmental entities arising from wrongful convictions if the plaintiff has received judicial relief absolving the plaintiff of guilt based on actual innocence. Okla. Stat. Ann. tit. 51, § 154 (West). Specifically, a court must find by clear and convincing evidence that the plaintiff did not commit the crime for which he was convicted, vacate the conviction and sentence, and provide that no further proceedings can be or will be held against the individual on any factors or circumstances alleged in the proceedings which resulted in the conviction. *Id.* at (B) (2) (e) (2). This has occurred in Plaintiff's case.

Plaintiff was convicted in 1991 and filed his post-conviction petition in 2017. (Doc. 13-4, Written Order, at ¶ 1). After significant discovery and briefing, the state criminal court conducted an evidentiary hearing on September 6, 2018 and January 24, 2019. *Id.* at ¶ 2. On July 16, 2019, the court provided its reasoning, vacated Plaintiff's conviction, and found him actually innocent based on clear and convincing evidence. (Ex. A, Transcript of Proceeding at 12; Doc. 13-4, Written Order). The court outlined the facts and circumstances which supported the finding, including that:

i) Plaintiff's conviction was based on eyewitness testimony which is known to be flawed (*Id*. at 6);

ii) no physical evidence connected Plaintiff to the crime of which he was convicted (*Id*. at 6-7);

iii) Plaintiff was questioned and searched twice on the night of the murder and no evidence was recovered from him (*Id*. at 7);

iv) The key witnesses, who were juveniles, were coerced by law enforcement into making their statements; (*Id*. at 7-8), and

v) Plaintiff and his friends were nearby after the crime occurred and cooperated with the police multiple times to offer the information they had and were let go each time; (*Id*. at 10-11).

The court added that based on the evidence presented there was a "fundamental miscarriage of justice" in Plaintiff's case. *Id.* at 12

Immediately after the court made this finding of fact, the attorney for the State of Oklahoma interrupted the judge to tell her he thought she could not make a finding of actual innocence in the post-conviction proceeding and would have to have a separate proceeding. *Id.* at 13-14. The court indicated to counsel that she was familiar with the relevant case law and that her finding of actual innocence at the post-conviction hearing was lawful. *Id.*

The court's written order tracked its oral findings set forth in the transcript:

On July 16, 2019, as a result of evidence presented by Mr. Atchison at the evidentiary hearing on his Applications for Post-Conviction Relief, this Court granted Mr. Atchison's request to vacate his judgment. In addition, **the Court found Mr. Atchison presented clear and convincing evidence of his actual innocence of the crime for which he was convicted in 1991.**

(Doc. 13-4 at ¶¶ 3-4 (emphasis added)). The court also clarified that the findings in the order were specifically directed to Plaintiff's actual innocence claim and that findings of fact on the postconviction claim would be entered in a separate order. *Id.* at ¶5.

Despite the plain language of the court order, which the City has included as an exhibit to its motion (Doc. 13-4), the City argues in its motion that "Judge Holmes has not yet made a finding of actual innocence as to Plaintiff." (Doc. 13 at 8). The City's position, like the state's position during the court's oral findings of fact, appears to be that the state criminal court had to preside over a separate hearing, with the same evidence, before it could reach its conclusion on actual innocence.

This Court finds the OGTCA makes no mention of a separate hearing and the state criminal court fulfilled each requirement that is included in the statute: it found by clear and convincing evidence that Plaintiff was actually innocent and provided that no further proceedings could or would be had in connection with the facts and circumstances alleged in the proceedings which resulted in conviction. Okla. Stat. Ann. tit. 51, § 154 (B) (2) (e ) (2); (Ex. A, Transcript of Proceedings; Doc. 13-4, Written Order).

### D. Indemnification and Respondeat Superior

Secondly, the City focuses on the issues of indemnification and respondeat superior. The Court finds these arguments are premature at this stage of the litigation. *See DeCorte v. Robinson*, 969 P.2d 358, 361(Okla. 1998) ("the question of whether a police officer was acting within the scope of his employment was a question of fact for the jury when there were conflicting inferences that could be drawn."); *Peterson v. Underwood*, 220 P.3d 1158, 1163 (Okla. Civ. App. 2009); *Craig v. City of Hobart*, 2010 WL 68057, at *3 (Okla. 2010)( tort of false arrest consists of making an arrest without probable cause which can be undertaken in good faith). The same result could occur in the instant case: Plaintiff could show that the Defendants pursued criminal charges without probable cause (thereby satisfying both the "malice" and "absence of probable cause"

20

elements) and in good faith.

### III. Conclusion

Accordingly, Defendants' Motions to Dismiss (Docs. 30, 31, 32, 40, 52, 53, 54 & 59) are converted to Motions for Summary Judgment. The City's Motion to Dismiss (Doc. 13) is denied. The parties are ordered to submit an agreed scheduling order within 10 days of the date of this Order which includes all remaining deadlines, as well as an opportunity for discovery and supplementation of the pending Motions for Summary Judgment.

**IT IS SO ORDERED**, this 7th day of March, 2022.

TERENCE C. KERN
United States District Judge