# United States District Court
## for the Northern District of Oklahoma

---

### Case No. 21-cv-286-JDR-SH

---

COREY ATCHISON,

*Plaintiff*,

*versus*

CITY OF TULSA, OKLAHOMA; ROBERT JACKSON; GARY MEEK; KEN MAKINSON; FRED PARKE; JACK PUTNAM; SCOTT ROGERS; MICHAEL EUBANKS; S M IRWIN; HAROLD WILSON, *also known as* BEAR WILSON,

*Defendants*.

---

### OPINION AND ORDER

---

Plaintiff Corey Atchison served twenty-eight years in prison for a murder he did not commit. He claims that Defendants Robert Jackson, Gary Meek, and Harold Wilson,[1] all former Tulsa Police Department officers, violated his constitutional rights by fabricating evidence, failing to disclose exculpatory evidence, depriving him of his liberty, and failing to intervene to prevent constitutional violations while investigating the crime. Dkt. 57 at 18-21. He also accuses the officers of intentional infliction of emotional distress and malicious prosecution in violation of state law. *Id.* at 23-25. Mr. Atchison further claims that Defendant City of Tulsa is liable for the constitutional violations under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), and the state law claims under theories of respondeat superior and indemnification. *Id.* at 23-26. Defendants have moved for summary judgment

---

[1] Mr. Atchison dismissed his claims against Defendants Ken Makinson, Fred Parke, Jack Putman, Scott Rogers, Michael Eubanks, and Samuel Irwin. Dkt. 162.

No. 21-cv-286

on each of Mr. Atchison's claims. Dkts. 148, 149, 150, 151. The City of Tulsa's and Officer Wilson's motions are granted. Detective Jackson and Detective Meek's motions are granted in part and denied in part.

## I

In the early morning hours of August 3, 1990, Detective Jackson was called to investigate a homicide at 400 South Atlanta Avenue in Tulsa, Oklahoma. Dkt. 150-3 at 1. When Detective Jackson arrived, he saw the victim, James Lane, lying on his back. *Id.* at 2. There was a gunshot wound to Mr. Lane's chest and a gun lying near his body. *Id.* at 2-3.[2] Other responding officers told Detective Jackson that Mr. Lane had "been in some type of confrontation near where his body lay on the ground and at the time there w[ere] no specific … suspects in th[e] case." *Id.* at 1.

### A. The Investigation

Officers talked to approximately thirty witnesses at the scene but obtained written statements from only two: Benjamin King[3] and Mareo Johnson. Dkt. 151-1 at 7. Mr. King stated that he heard two or three gunshots around 2:20 a.m., walked around the corner, and saw a body lying on the ground. Dkt. 150-4. Mr. Johnson told a similar story. Dkt. 150-5; Dkt. 151-1 at 4. One witness told the officers that he saw someone leaving the area in a white car. Dkt. 151-1 at 7. Several witnesses stated that they saw men arguing with Mr. Lane, but it was too dark to identify anyone. *Id.* at 36.

At 4:00 a.m., TPD officers pulled over Mr. Atchison, who was driving a maroon Buick LeSabre out of the parking lot of an apartment near the crime scene. Dkt. 171-14. Mr. King, Mr. Johnson, and one other passenger were also in the car. *Id.* The officers' report indicated they conducted a "field

---

[2] This gun was never linked to the bullet that killed Mr. Lane nor to any of the suspects. TPD tested a different gun, but it was not the murder weapon. Dkt. 151-1 at 58.

[3] Benjamin King is referred to as both Benjamin Grisham and Benjamin King. For consistency, the Court will refer to him exclusively as Mr. King. Dkt. 151 at 5.

No. 21-cv-286

interview" but there are no notes from that interview. *Id.* The officers searched Mr. Atchison, his car, and the passengers, but found nothing. Dkt. 171-2 at 78. The four young men then left. *Id.* The officers described Mr. Atchison in their report as a black male, 6'2" and 265 pounds. Dkt. 171-14 at 1.

Later that same morning, officers interviewed witness Stephanie Jacob who told Detective Jackson that she and two friends were walking down the street before the shooting when they saw a group of black men talking to Mr. Lane. Dkt. 150-6 at 1-2. Sensing trouble, Ms. Jacob and her friends turned to walk away. *Id.* at 2. As they turned, they saw Mr. Lane pull a "large amount of cash" out of his pocket and the other men attack him. *Id.* Ms. Jacob told Detective Jackson that "a black male that she knows as Steve obtained a gun from his right sock," fired an initial shot which missed, fired a second shot that caused Mr. Lane to fall to the ground, and then fired three more shots. *Id.* She identified the other men involved in the altercation as "Jeff," "Bo," and "Short Dog," and told Detective Jackson that these men could be found at a house located at Cheyenne Avenue from about 5:30 p.m. to 6:00 p.m. every day. *Id.* at 2-3. She described Steve, the shooter, as a black male, 5'8" and 140 pounds. *Id.* at 2. Detective Jackson recorded all of this information in a written report. Dkt. 150-6.[4]

Two days after the shooting, TPD officers pulled over Mr. Atchison again. Dkt. 171-10. This time, Mr. Atchison was driving a gold Jeep. *Id.* at 1. Officers conducted a field investigation and then permitted Mr. Atchison to leave. The officers once again described Mr. Atchison as a black male, 6'1" and 260 pounds. *Id.*

---

[4] Mr. Atchison alleges that his attorney did not receive this report until one week before trial. His attorney moved to continue the trial, but the Court denied the request. *See infra*, Section I(e). The allegation that this report was intentionally withheld by the detectives to prevent Mr. Atchison from using the information at trial is the basis for one of Mr. Atchison's § 1983 *Brady* violation claims. *See infra*, Section III(A)(2).

No. 21-cv-286

On August 7, 1990, TPD Detective Ken Makinson received a phone call from "Lisa" who reported that two men named Wayne Jones and Reggie Patterson robbed Mr. Lane and that Mr. Jones shot him. Dkt. 151-1 at 11, 52. She also stated that Andre Green and Mr. Atchinson were with the two men during the shooting and that the four men were members of a gang. *Id.* Following that call, TPD brought Mr. Atchison into the station for an interview. Dkt. 151-1 at 52-53. Mr. Atchison told Detective Jackson that he was driving down the road and turned on Atlanta when he heard gunshots. *Id.* at 53. Once he completed the turn, he saw Mr. Lane, who was already lying on the ground. *Id.* Mr. Atchison then parked his car and walked over to check on Mr. Lane. *Id.* He did not see the shooter. *Id.*

A few days later, TPD officers arrested (for an unrelated crime) Reginald Patterson near the location of Mr. Lane's shooting. Dkt. 151-1 at 56. During Mr. Patterson's arrest, a neighbor flagged down an officer and told him that he knew Mr. Lane and saw him with Macio McClendon, Mr. Patterson, and a black man with a shaved head the night of the shooting. *Id.* The neighbor identified the man with the shaved head as the shooter. *Id.*

In September, Detective Jackson interviewed Mr. King a second time. Dkt. 151-1 at 54. Mr. King said he was riding around with Mr. Atchison in a gold Oldsmobile on the night of the shooting. *Id.* He told Detective Jackson that when the car turned the corner, he heard a gunshot, saw Mr. Lane fall to the ground, and saw a person run away down the alley. *Id.* The person who ran from the scene got into a dark Cadillac and drove away. *Id.* Mr. King also told Detective Jackson that he had heard the shooter was a 15-year-old black male, LaCount Washington McClendon. *Id.*

On November 1, 1990, Detective Jackson interviewed Leticia Nottingham, a woman who lived near the crime scene. Dkt. 151-1 at 9-10. Ms. Nottingham said that, around 3:00 a.m. on the morning of the shooting, she heard arguing outside her apartment and saw "two black males and a white male

No. 21-cv-286

arguing with the victim." *Id.* at 9. Ms. Nottingham saw the shooting and de-
scribed the shooter as 5'8" to 5'9" and 160 to 170 pounds. *Id.*[5] Detective
Jackson believed this information to be "consistent with information that
[was] derived by Det. Fred Parke, which indicate[d] that a possible suspect in
this case could be a black male known by the street name of Candyman." *Id.* at
9-10. He stated that Detective Parke's report also indicated that Ms. Notting-
ham's description of the shooter was consistent with "Candyman's" physical
description. *Id.* at 10.

## B. The Interviews

On February 8, 1991, Detective Jackson interviewed sixteen-year-old
Doane Thomas [Dkt. 150-13], fifteen-year-old Demacio McClendon [Dkt.
151-1 at 73-85], and sixteen-year-old Benjamin King [Dkt. 151-1 at 86-96]. De-
tective Meek was present for all three interviews. Each witness was held for
several hours, but only fifteen to twenty minutes of each interview were rec-
orded. Mr. Atchison alleges that during the unrecorded portions of the inter-
views, the detectives told the witnesses that Mr. Atchison was the shooter,
then coerced false statements implicating Mr. Atchison.

During the taped portion of his interview, Mr. Thomas stated that he
was in the area the night of the shooting when he ran into Demacio McClen-
don. Dkt. 150-13. Mr. McClendon told Mr. Thomas that the people getting
out of a jeep across the street were going to rob someone. *Id.* Mr. Thomas
said he saw men assaulting Mr. Lane, saw Mr. Atchison pull out a gun and
shoot Mr. Lane, and saw the men get back into the jeep and leave. *Id.* Mr.
Thomas walked away from the scene once he heard the gunshot. *Id.* Detective
Jackson asked Mr. Thomas why he waited so long to talk to police, and Mr.
Thomas stated he was scared that the men would come after him and kill him.

---

[5] Like Detective Jackson's report from his interview with Ms. Jacob's, Mr. Atchison
claims that this report was not disclosed to his attorney until a week before trial. *See infra*,
Section I(e). This allegation is also the basis for one of Mr. Atchison's § 1983 *Brady* violation
claims. *See infra*, Section III(A)(2).

No. 21-cv-286

*Id.* Mr. Thomas identified Mr. Atchison based on a photo the detectives showed him. *Id.*

During the taped portions of Mr. McClendon's and Mr. King's interviews, they gave similar statements identifying Mr. Atchison as the shooter. Dkt. 151-1 at 73-96. Mr. McClendon stated that he "heard pow to the head somewhere, and [Mr. Lane] just fell down to the ground." Dkt. 151-1 at 80. When Detective Jackson asked him about the shooter, Mr. McClendon stated "I think it was, uh, [Mr. Atchison]. I don't know which one it was really. I'm just trying to say." *Id.* at 82. Mr. King stated that he did not see Mr. Atchison with a gun, but it was "obvious he shot him ... because that dude was in front of him ...." *Id.* at 95. These statements were the only statements taken during the investigation implicating Mr. Atchison.

### C. The Prosecution Report

On February 11, 1991, Detective Meek prepared and presented a prosecution report to the district attorney. Dkt. 171-20. The report identified Mr. Atchison and the three men in his car as suspects and recommended charging them with first-degree murder and armed robbery. *Id.* The report listed Mr. Thomas and Mr. McClendon as witnesses who saw Mr. Atchison shoot Mr. Lane. *Id.* at 2. The report stated that Mr. King "admitted to th[e] offense" when Detective Jackson interviewed him. *Id.* The district attorney's office sought arrest warrants based on the report. Dkt. 151-6 at 2-4.

When Mr. Atchison was arrested, he told officers that he was not involved in the shooting and maintained his innocence. Dkt. 151-1 at 31. Following Mr. Atchison's arrest, Detective Jackson drafted a supplementary offense report identifying Mr. Atchison and the three other men as suspects. Dkt. 151-1 at 30-31. Detective Jackson identified a gold Jeep Cherokee as the "suspect vehicle" in the report. *Id.* at 31.

No. 21-cv-286

### D. The Preliminary Hearing

The four defendants appeared for their preliminary hearing on March 25, 1991. Dkt. 149-8. Assistant District Attorney Tim Harris called Mr. Thomas as the state's first witness. *Id.* at 3, 7. Mr. Thomas testified that he saw Mr. Atchison and the other defendants get out of a gold Jeep Cherokee, run across the street, and attack Mr. Lane. *Id.* at 12-13, 15. He testified that he started to run away from the scene, briefly glanced back, and saw Mr. Atchison "pull the trigger." *Id.* at 18-19, 22. On cross-examination, Mr. Thomas testified that it was very dark that night and that it was hard for him to distinguish the defendants; he saw "red shirts and fists flying and that's it." *Id.* at 41-43.

Mr. McClendon testified that, on the night of the shooting, he told Mr. Thomas that some gang members were about to rob someone. Dkt. 149-8 at 91. He saw a brown Cherokee pull up and saw the four defendants get out, walk across the street, and attack Mr. Lane. *Id.* at 92-95. During cross-examination, the following exchange occurred:

> Q. On direct examination when Mr. Harris was asking you questions in reference to the statement that you gave to police, you said, "He threatened me to say it." What did you mean by that?
>
> THE WITNESS: Is he in the courtroom right now?
>
> THE COURT: No.
>
> A. He threatened me to say Corey did it, shot the man.
>
> Q. Who threatened you to say that?
>
> A. Police.
>
> Q. One of the detectives?
>
> A. Yes, he [was] going to throw me in jail until I sa[id] Corey did it.
>
> Q. He was going to throw you in jail until you said that Corey did it?

No. 21-cv-286

A. Yes.

*Id.* at 113-14.

Mr. McClendon then testified that officers came to his school, took him to the detective division for questioning, and refused to call his mom. *Id.* at 114-15. Eventually, Mr. McClendon conceded that his prior statement to police was a lie:

> Everything I said downtown, it was a story, and [the detective] made me say that Corey did this, Corey did that. Did you see Corey shoot the man? Did you see this? Man, I wasn't even there. They were making me say it. They made [me] say all that that they got down on tape.

*Id.* at 116. When the Court asked Mr. McClendon if he was there the night of shooting, he said no. *Id.* at 119. Based on this exchange, the Court took a recess and asked the defense attorneys, Mr. Harris, and Mr. McClendon to meet in chambers. *Id.* at 120.

In chambers, Mr. McClendon testified that Mr. Thomas lied about being with him during the shooting. *Id.* at 121. Mr. McClendon also testified that, prior to the preliminary hearing, he told Mr. Harris that he was afraid to testify and that the police pressured him to identify Corey as the shooter. *Id.* at 124-125. Mr. Harris asked: "But when I read the statement to you line-by-line, you told me a lot of the information about the Cherokee and the people that were in the Cherokee and the location that had pulled up, that that was all true?" *Id.* at 125. Mr. McClendon told the Court he gave Mr. Harris that information because he was scared and "didn't know what to say." *Id.* When asked how he knew Mr. Atchison was driving a Jeep Cherokee, Mr. McClendon replied "because that's what they were riding in all the time." *Id.* Mr. McClendon also stated that he felt he had to lie at the preliminary hearing because Mr. Harris "wouldn't understand." *Id.* at 128, 131.

Following the meeting in chambers, the preliminary hearing continued with Detective Jackson's testimony. Detective Jackson recounted his

No. 21-cv-286

investigative efforts and denied threatening or coercing Mr. McClendon into making a statement. *Id*. at 140-144. At the end of the preliminary hearing, the Court granted the State's motion to dismiss the charges against Mr. Johnson for lack of probable cause. *Id*. at 165. The Court granted all of the defendants' demurrers except for Mr. Atchison's murder count, which the Court took under advisement until it could hear testimony from the medical examiner. *Id*. at 168-69.

At the follow-up hearing two days later, the medical examiner testified about Mr. Lane's autopsy and his cause of death. *Id*. at 172-83. Mr. Atchison renewed his demurrer because the "case … turned on the credibility of one witness. That witness being Mr. Doane Thomas." *Id*. at 183. The Court found that there was enough evidence to bind Mr. Atchison over for trial and overruled the demurrer. *Id*. at 185.

### E. The Jury Trial

The trial was scheduled to begin in June 1991. On June 6, 1991, Mr. Atchison's attorney moved to continue the jury trial because he had just received supplementary offense reports detailing interviews in which Ms. Jacob and Ms. Nottingham[6] described the shooter as having physical features inconsistent with those of Mr. Atchison. Dkt. 171-25. Mr. Atchison's attorney argued that these reports "indicat[ed] the existence of certain eyewitnesses … who … identif[ied] a person or persons other than Defendant as the perpetrator of the alleged murder" and that he needed "additional time to locate these witnesses, ascertain their testimony and subpoena them for trial." *Id*. at 1. The motion was denied, and the trial began as scheduled on June 11, 1991.

Mr. Thomas, Detective Jackson, Mr. King, the medical examiner, and four other TPD officers testified for the State. Dkt. 171-2 at 2-3. Mr. Thomas testified consistently with his testimony during the preliminary hearing; Mr.

---

[6] *See supra*, I(A).

No. 21-cv-286

Thomas admitted, however, to lying about Mr. McClendon's presence during the shooting because he wanted to protect his pregnant girlfriend, who was with him. *Id.* at 80-129. Detective Jackson testified about his investigation and the interview where Mr. King identified Mr. Atchison as the shooter. *Id.* at 134-161. He denied using any type of coercion, force, or promise to obtain Mr. King's statement. *Id.* at 150.

When Mr. Harris asked Mr. King about the recorded interview, Mr. King stated that, before the officers began taping, they yelled at him and told him he would either get the death penalty or go to jail for the rest of his life unless he identified Mr. Atchison as the shooter. *Id.* at 186, 207. Mr. Harris then asked Mr. King who he identified as the shooter in that interview and Mr. King replied: "I said it against my will, but I said it was Corey." *Id.* at 187. Mr. King also stated:

> That whole tape was ... lies. They made me say that. They was saying all kinds of stuff to me. I couldn't even leave the detective room. I tried to leave. They kept on saying, just book him in jail for first degree murder. I got up, you know, to go, and I said, well, just take me on down, and they was saying, no, sit down, sit down. I couldn't even leave the room to go before I made the statement.

*Id.* at 188. He further testified that the officers picked him up from school right after lunch and held him in the interrogation room until 6:30 p.m. *Id.* at 189. He was not booked into the jail until around 10:00 p.m. *Id.* at 196. On cross-examination, Mr. King testified that "Corey Atchison was in the car with us. He didn't shoot James Warren Lane." *Id.* at 197. On redirect, the State played the taped interview from February for the jury. *Id.* at 205. Following Mr. King's testimony, the State rested.

Mr. Atchison took the stand in his own defense. His testimony was consistent with his previous statements to the police: He was driving in his car when he heard a gunshot, turned the corner, and saw Mr. Lane lying on the ground. Dkt. 171-2 at 211-25. Mr. Atchison testified that he did not kill

No. 21-cv-286

Mr. Lane. *Id.* at 218. Mr. Johnson testified on Mr. Atchison's behalf, corroborating Mr. Atchison's story. *Id.* at 226-33. Following Mr. Johnson's testimony, the defense rested. *Id.* at 233. The jury found Mr. Atchison guilty of first-degree murder and sentenced him to life in prison.

### F. Post-Conviction Proceedings

In 2016, Mr. King signed an affidavit maintaining that Mr. Atchison did not shoot Mr. Lane and that he had been threatened and coerced by detectives to identify Mr. Atchison as the shooter. Dkt. 171-3. And in 2017, Mr. Thomas, the sole eyewitness to identify Mr. Atchison as the shooter at trial, drafted and signed an affidavit stating that he did not see who shot Mr. Lane, but he knew it was not Mr. Atchison because he saw him arrive at the scene afterwards. Dkt. 171-7. He asserted that the officers coerced him into identifying Mr. Atchison as the shooter. *Id.* at 2. He further stated that, when he told Mr. Harris the truth, Mr. Harris told him that Mr. Atchison "would get out of jail and kill [him]" if he did not testify that Mr. Atchison was the shooter. *Id.* at 2-3. Following Mr. Atchison's conviction, Mr. Thomas told Mr. Harris on several occasions that his statements to the police and testimony at the preliminary hearing and trial were not true. Mr. Harris "told [him] that if he ever heard those words out of [his] mouth again he would make sure [Mr. Thomas] spent 25 years behind bars." *Id.* at 3-4. Based on these affidavits, combined with several other perceived errors at trial and on appeal, Mr. Atchison filed for post-conviction relief on the basis of actual innocence.

On July 16, 2019, Judge Sharon Holmes granted Mr. Atchison's request. Dkt. 171-22. Judge Holmes found that Mr. Atchison's conviction "was based solely on eyewitness testimony" from "children who ranged in age from 15 to about 17" and was obtained without "any physical evidence to connect Mr. Atchison to th[e] crime." *Id.* at 6-7. Judge Holmes also found that TPD coerced the alleged eyewitnesses and that, without this coerced testimony, no reasonable juror could have found that Mr. Atchison shot Mr. Lane.

No. 21-cv-286

*Id.* at 8, 11. Based on her finding of actual innocence, Judge Holmes vacated Mr. Atchison's conviction. *Id.* at 15.

Mr. Atchison filed this action in July 2021 and then filed a corrected complaint in February 2022 bringing claims under 42 U.S.C. § 1983 for violations of his constitutional rights as well as state-law claims. Dkts. 2, 57. Defendants have moved for summary judgment. Dkts. 148, 149, 150, 151. The three officers argue that they are entitled to qualified immunity and that Mr. Atchison's § 1983 claims are time-barred. Dkts. 148, 149, 150. The City agrees and argues that no City policy or custom was the moving force behind any alleged violation. Dkt 151. All Defendants argue that Mr. Atchison has failed to state a viable state-law claim.

## II

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When resolving a motion for summary judgment, the Court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (citation omitted).

## III

The Court begins with Mr. Atchison's claims under 42 U.S.C. § 1983.[7] Mr. Atchison alleges that the officers violated his constitutional rights in four

---

[7] To obtain relief under 42 U.S.C. § 1983, Mr. Atchison must show that he was deprived of a federally protected right by a person acting under color of state law. *See, e.g., id.* The parties do not dispute that the officers were acting under color of state law during the investigation of Mr. Lane's murder and Mr. Atchison's prosecution; accordingly, the

No. 21-cv-286

ways: First, by fabricating evidence. Second, by failing to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). Third, by conspiring together to violate Mr. Atchison's rights. And fourth, by failing to intervene when his rights were violated. Dkt. 57 at 18-21. He also alleges that the City is liable for these constitutional violations because they were caused by its policies, practices, and customs. *Id.* at 21-23. The officers argue they are entitled to qualified immunity because their actions during the investigation did not violate Mr. Atchison's constitutional rights and they were not on notice that their actions violated any constitutional rights. Dkt. 148 at 12-19; Dkt. 149 at 14-22; Dkt. 150 at 14-24. The officers alternatively argue that Mr. Atchison's § 1983 claims are time-barred. Dkt. 148 at 19-21; Dkt. 149 at 23-24; Dkt. 150 at 24-26.

## A. Qualified Immunity

Qualified immunity shields officers "'from damages actions unless their conduct was unreasonable in light of clearly established law.'" *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).[8] It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Once a defendant asserts qualified immunity, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time

---

Court focuses its analysis on whether the officers violated Mr. Atchison's constitutional rights.

[8] Mr. Atchison argues that the officers are not entitled to qualified immunity because "[t]here is no statutory or common law basis to afford immunity to police officers who are sued under § 1983 for violations of the constitutional rights of civilians." Dkt. 172 at 30. But there is long-standing Supreme Court and Tenth Circuit precedent recognizing the doctrine of qualified immunity, and this Court is bound to follow that precedent. *Nidiffer v. Lovato*, No. 24-2056, 2025 WL 719814, at *2 (10th Cir. Mar. 6, 2025).

No. 21-cv-286

of the violation. *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1272 (10th Cir. 2022) (citing *Pearson*, 555 U.S. at 232). If the plaintiff fails to establish either prong, the Court must grant qualified immunity and enter summary judgment in favor of the defendant. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).

## 1. Fabrication of Evidence

Mr. Atchison first argues that the detectives[9] violated his Fourteenth Amendment due process rights when they fabricated evidence to use against him at the preliminary hearing and trial. The Fourteenth Amendment's Due Process Clause guarantees the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021). To prevail on a claim for violation of that guarantee, Mr. Atchison must prove that: (1) the officers knowingly fabricated evidence, (2) the fabricated evidence was used against Mr. Atchison, (3) the use of the fabricated evidence deprived Mr. Atchison of liberty through a criminal conviction, and (4) the conviction has been vacated. *Id.*

Mr. Atchison has presented sufficient evidence upon which a reasonable jury could determine that Detectives Jackson and Meek fed Mr. Thomas, Mr. McClendon, and Mr. King false information that was used to deprive Mr. Atchison of his liberty. For example, Mr. Atchison has pointed to significant inconsistencies in the recorded statements regarding the type and color of the car he was driving the night of the shooting. He has also presented evidence that a large portion of the interviews were not recorded, and that Mr. McClendon and Mr. King recanted their statements implicating Mr. Atchison prior to trial. A reasonable jury could determine, based on that evidence, that the detectives fabricated a narrative to implicate Mr. Atchison and forced the witnesses to make false statements which resulted in Mr. Atchison's conviction. *See, e.g., O'Connell v. Alejo*, No. 18-cv-01359-RBJ,

---

[9] The claims against Detective Jackson and Detective Meek will be analyzed together. The Court will consider Officer Wilson's liability separately.

No. 21-cv-286

2020 WL 1244852, at *7-8 (D. Colo. Mar. 16, 2020), *aff'd on other grounds sub nom. O'Connell v. Tuggle*, No. 20-1148, 2021 WL 5973048 (10th Cir. Dec. 16, 2021).

The Court must next determine whether it was clearly established in 1991 that the detectives' conduct violated Mr. Atchison's rights. A right is clearly established if a reasonable officer "would understand that what he is doing violates that right." *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (citation omitted). It has been long established by the Supreme Court "that a defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction ...." *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)). Thus, officers in 1991 would have been on notice that falsification of evidence was a constitutional violation. Detectives Jackson and Meek are not entitled to qualified immunity and the falsification of evidence claims will proceed to trial on a theory that the detectives provided the witnesses with false information to frame Mr. Atchison and then put that false information in the prosecution report.

## 2. *Brady* Violations

Mr. Atchison next claims that the detectives deprived him of his constitutional right to a fair trial under the Fourteenth Amendment by "withholding and suppressing exculpatory evidence." Dkt. 57 at 18. In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). These *Brady* obligations extend to police officers "who are actively involved in a particular investigation." *Tiscareno v. Anderson*, 639 F.3d 1016, 1022 (10th Cir. 2011) *vacated in part on other grounds*, 421 F. App'x 842 (10th Cir. 2011).

No. 21-cv-286

Mr. Atchison argues that the detectives violated his rights under *Brady* by coercing false statements, relying on those false statements when drafting the supplementary offense report and the prosecution report, and suppressing the "truthful exculpatory statements of various witnesses" and "the coercive tactics … used to obtain the inculpatory statements used in the prosecution." Dkt. 170 at 27-28. He also points to several items missing from the investigation file: maps referenced in interviews; photographs used for suspect identifications; the recording and/or transcript of Ms. Nottingham's interview; and a report documenting an interview of Mr. Patterson. *Id.* at 29-30.

To prevail on his § 1983 claim based on a *Brady* violation, Mr. Atchison must show "that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019) (quoting *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008)). "[E]vidence is 'material … when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 470 (collecting cases).

Most of the evidence Mr. Atchison identified was neither withheld nor material to his defense, so the detectives' alleged failure to disclose it was not a *Brady* violation. To the extent that any maps or photographs existed that were used during Mr. Thomas, Mr. McClendon, or Mr. King's interviews, they were not suppressed. Mr. Atchison's attorney knew these items existed based on recordings, transcripts, and testimony provided prior to trial, and there is no evidence that Mr. Atchison's attorney sought this information. Further, there is no evidence that these items would have been favorable to Mr. Atchison or that these items would have called Mr. Atchison's conviction

No. 21-cv-286

into question, as the location of the shooting was not in dispute. There is no evidence that the photos used to identify Mr. Atchison during the interview would have been favorable or material to his defense. *See, e.g., United States v. Holloway*, 939 F.3d 1088, 1105 (10th Cir. 2019) (holding that the defendant's *Brady* violation failed "because he d[id] not even *attempt* to argue that the documents in the receiver's possession [were] favorable to him").

Likewise, Mr. Atchison has failed to present evidence demonstrating that a report of Mr. Patterson's interview was withheld, favorable to Mr. Atchison, or material. Although the report drafted on August 11, 1990, which identified an alternate suspect as the shooter, is absolutely exculpatory, Mr. Atchison's attorney had access to the report and could have interviewed either Mr. Patterson or the neighbor prior to trial. There is no evidence that another missing document would have resulted in information different from what was already available to Mr. Atchison's attorney or that it would have changed the proceedings in any way. *See, e.g., Sandoval v. Ulibarri*, 548 F.3d 902, 915 (10th Cir. 2008) (concluding that the defendant must establish that "his [*Brady*] theory was more than speculation").

Mr. Thomas's, Mr. McClendon's, and Mr. King's truthful, exculpatory statements are different. All three statements, and the coercive tactics used to obtain those statements, were material to Mr. Atchison's defense. Information that these statements were false and knowledge of the tactics used to obtain the statements would have been favorable to Mr. Atchison at trial. There is no evidence that the detectives ever told the district attorney or defense counsel that the statements were false or that they used coercive techniques to obtain the statements. Thus, the fact that the statements were false combined with the tactics used by the detectives to obtain those statements can form the basis of a § 1983 *Brady* claim.

Mr. Atchison also alleges that his constitutional rights were violated by the late disclosure of Detective Jackson's August 3 and November 1

No. 21-cv-286

reports, both of which recorded statements indicating that the shooter's height and build differed from Mr. Atchison's.[10] Mr. Atchison's attorney asked the trial court for an extension to pursue those leads, but the request was denied. It is clear from the record that the presence of two eyewitnesses who described the shooter as someone much smaller than Mr. Atchison would have called the credibility of Mr. Thomas's testimony into question. Mr. Atchison has presented sufficient evidence from which a reasonable jury could determine that this evidence was favorable and material to Mr. Atchison's defense, but because of the detectives' late disclosure, he was prevented from presenting it at trial.

*Brady* would have undoubtedly put the detectives on notice in 1991 that failing to disclose the witnesses' truthful exculpatory statements, the tactics used to coerce the false statements, and the two reports describing a different perpetrator violated Mr. Atchison's constitutional rights. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (holding that the state was clearly on notice in 1986 that "knowingly us[ing] false testimony to obtain a conviction" and "withhold[ing] exculpatory evidence from the defense" is a due process violation). Mr. Atchison's § 1983 claims may proceed against Detective Jackson and Meeks based on those Defendants' failure to comply with their well-established obligations under *Brady*.

### 3. Deprivation of Liberty without Probable Cause

Mr. Atchison's third claim alleges that the officers "used false evidence that they had manufactured in order to accuse [him] of criminal activity and cause the deprivation of [his] liberty, without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments." Dkt. 57 at

---

[10] Mr. Harris testified that he knew information about a potential alternate suspect was exculpatory and that he would have turned that information over to the defendant as soon as he received it. Dkt. 171-6 at 24-25, 40-41, 47-49. Because the two reports were not disclosed until a week before trial, Mr. Atchison argues that the detectives were responsible for the delay. Dkt. 170 at 30.

No. 21-cv-286

19. The detectives argue that they did not cause Mr. Atchison to be arrested and that there was sufficient probable cause for the arrest. Dkt. 149 at 19-20; Dkt. 150 at 20-22.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons … against unreasonable … seizures." A Fourth Amendment malicious prosecution claim brought under § 1983 requires a showing that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023) (emphasis omitted); *see also Thompson v. Clark*, 596 U.S. 36, 49 (2022). The Tenth Circuit "takes the common law elements of malicious prosecution as the 'starting point' for the analysis of a § 1983 malicious prosecution claim [] but always reaches the ultimate question … of whether the plaintiff has proven a *constitutional* violation." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996).

The first requirement is satisfied. Mr. Atchison has provided evidence that Detectives Jackson and Meek provided Mr. Thomas, Mr. McClendon, and Mr. King with false information and then coerced false statements to craft a narrative that Mr. Atchison was the shooter. The detectives then drafted a prosecution report that identified Mr. Atchison as the shooter based on those statements. Dkt. 171-20. The district attorney's office relied on that report when it found probable cause to arrest Mr. Atchison. Dkt. 151-6 at 3-4. The judge who held Mr. Atchison over for trial also relied on the coerced false statement without any physical evidence or any other eyewitness testimony. Dkt. 151-6 at 13-14, 22-23. A jury could determine that Mr. Thomas's interview and testimony as the sole eyewitness identifying Mr. Atchison as the shooter was the probable cause that led to Mr. Atchison's arrest and prosecution.

No. 21-cv-286

Mr. Atchison has satisfied the second element because his conviction was vacated. Dkt. 171-22 at 12-15. *See Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th Cir. 2018) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004)). The third element, which requires proof that no probable cause supported the arrest is also met. When considering this element, the Court asks whether a reasonable officer could have found probable cause to support Mr. Atchison's detention pending trial in 1991. *See, e.g., Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citation omitted). Probable cause for an arrest exists when the information is sufficient "to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *Henry v. United States*, 361 U.S. 98, 102 (1959)).

A Fourth Amendment violation can occur "when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017). When a probable-cause determination takes fabricated evidence into account, the Court must determine whether the same result would have been reached without the fabricated evidence. That is not the case here. When you strip Mr. Thomas's and Mr. McClendon's interviews from the prosecution report, there is nothing left linking Mr. Atchison to the crime: There was never any physical evidence tying Mr. Atchison to the crime scene. Mr. Atchison has met his burden of showing that the State lacked arguable, probable cause for his arrest and prosecution without the allegedly false statements.

Mr. Atchison has presented sufficient evidence to permit a jury to find malicious prosecution in violation of Mr. Atchison's Fourth and Fourteenth Amendment rights. Furthermore, Mr. Atchison's right to be free from malicious prosecution was clearly established at the time of the investigation. As the Tenth Circuit has recognized, "[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information

No. 21-cv-286

supplied to support a warrant for arrest." *Pierce*, 359 F.3d at 1298. Detectives Jackson and Meek's requests for qualified immunity from the § 1983 malicious prosecution claims are denied, and the claims may proceed to trial.

### 4. CONSPIRACY

Mr. Atchison also claims that the TPD Officers acted together to frame him for Mr. Lane's murder, deprive him of his constitutional rights, fabricate evidence, and withhold exculpatory evidence. Dkt. 57 at 20. To survive summary judgment on his § 1983 conspiracy claim, Mr. Atchison must present evidence raising a triable issue of fact about "(1) a shared conspiratorial objective, i.e., an agreement to deprive Plaintiff of his constitutional or statutory rights; (2) concerted action; and (3) actual deprivation of rights." *Kinkead v. Durborow*, No. 08-cv-562-JHP-FHM, 2011 WL 3438405, at *10 (N.D. Okla. Aug. 5, 2011) (citing *Snell v. Tunnell*, 920 F.2d 673, 701-02 (10th Cir. 1990)). "Mere conclusory allegations of conspiracy, unsupported by a factual showing of any type of agreement and concerted action among Defendants, are insufficient to support a conspiracy action." *Roberts v. Champion*, 255 F. Supp. 2d 1272, 1295 (N.D. Okla. 2003) (citations omitted).

Mr. Atchison has failed to present evidence from which a jury could determine that Detectives Jackson and Meek agreed to deprive Mr. Atchison of his constitutional rights. The only evidence provided in support of the conspiracy claims is that Detectives Jackson and Meek conducted the February 8 interview together. This, standing alone, is insufficient to create a genuine issue for trial about whether the two men agreed to feed Mr. Atchison false information or withhold *Brady* information from the prosecutor, and it is also insufficient to support the conclusion that there was concerted action to achieve these goals. *See, e.g., Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (per curiam) ("Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."); *see also McKibben v. Chubb*, 840 F.2d 1525, 1533 (10th Cir. 1988) (affirming district court's decision granting defendants' motions for summary judgment on the conspiracy claims because there was no

No. 21-cv-286

evidence of meeting of the minds). Accordingly, the conspiracy claims cannot proceed to trial.

### 5. FAILURE TO INTERVENE

Last, Mr. Atchison alleges that Detective Meek[11] "stood by without intervening to prevent the violation of [Mr. Atchison's] constitutional rights, even though [he] had the opportunity to do so." Dkt. 57 at 21. Detective Meek argues that Mr. Atchison has failed to point to evidence that he had knowledge of a constitutional violation or an opportunity to intervene. Dkt. 148 at 18-19. He also argues that a failure-to-intervene claim was not clearly established in 1991. *Id.*

"The Tenth Circuit has recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (internal quotation marks and citations omitted). To bring a failure-to-intervene claim, Mr. Atchison must show "that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about the constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Id.* (citations omitted).

Mr. Atchison has presented evidence that Detective Meek witnessed Detective Jackson's allegedly unconstitutional actions during Mr. Thomas's February 8 interview and could have intervened. He has also presented evidence that Detective Meek knew that the information provided to the district attorney's office was either false or incomplete. The question, then, is whether Mr. Atchison's right to have Detective Meek intervene during the interview was clearly established in 1991. The Tenth Circuit recently held in

---

[11] Mr. Atchison has agreed to dismiss the failure to intervene claim against Detective Jackson. Dkt. 170 at 34 n.10. Detective Jackson's motion for summary judgment on the failure to intervene claim is granted.

No. 21-cv-286

a similar case that this type of failure to intervene claim was not clearly established in 1999. Dkt. 172 at 34 (citing *Bledsoe*, 53 F.4th at 617). But here, Mr. Atchison raises an argument that was not raised in *Bledsoe*: that Detective Meek's duty to intervene "would have 'been obvious to any objectively reasonable law enforcement officer.'" *Id.* Detective Meek does not respond to this argument. Dkt. 193 at 16.

Detective Meek testified during his deposition that, as a police officer, he was obligated to report any police officer misconduct to internal affairs or his supervisor and that it would be wrong to threaten a suspect with the death penalty as an interrogation technique because it would be a "borderline civil rights violation" and "coercive." Dkt. 171-9 at 20, 44-45. He also testified that police officers are required to take an oath to uphold the law which includes being honest. *Id.* at 139. By Detective Meek's own admission, it would have been obvious to any objectively reasonable police officer, even in 1991, that he should intervene or report to a supervisor if another detective provided a witness with false information and then coerced a false statement by threatening him with the death penalty during an interview. Thus, Detective Meek is not entitled to qualified immunity from Mr. Atchison's claim based on Detective Meek's alleged failure to intervene during the witnesses' February 8 interviews.

### 6. Officer Wilson

Mr. Atchison's claims are largely based on the detectives' February 8 interviews and their failure to provide the district attorney with exculpatory evidence. But Mr. Atchison has failed to present any evidence that Officer Wilson was in any way involved in these violations. The evidence shows that Officer Wilson picked up Mr. King from school and transported him to the interview. Dkt. 148 at 12. Mr. Atchison argues that Officer Wilson also helped Detective Meek pick up Mr. Thomas, take him to the detective division, and conduct a second interview in March 1991. Dkt. 175 at 13-14. During this alleged second interview, Mr. Atchison argues that Officer Wilson "insisted

No. 21-cv-286

that [Mr. Atchison] shot Mr. Lane, threatened [Mr.] Thomas by telling him he could not go home, and continuously badgered and coerced him until [Mr.] Thomas, scared, agreed to falsely implicate [Mr. Atchison]." *Id.* at 14. But the record evidence does not support that claim.

The only evidence Mr. Atchison points to in an effort to create a genuine issue of material fact of Officer Wilson's involvement is Mr. Thomas's testimony at the 2018 post-conviction hearing where he stated that he talked to Officer Wilson. Dkt. 149-13 at 47. But when questioned about his memory during that same hearing, Mr. Thomas stated "Sir, I don't remember. I was young, 17, 28 years ago. Smoked a lot of weed." *Id.* at 83. This testimony alone, which contradicts his own 2017 affidavit and the investigation reports, is not sufficient evidence to permit a reasonably jury to find that Officer Wilson gave Mr. Thomas false information that was later used to convict Mr. Atchison or was aware that the detectives did so. Accordingly, there is no evidence that Officer Wilson violated Mr. Atchison's constitutional rights, and he is entitled to qualified immunity on all the claims. *See, e.g., Shash v. City of Pueblo*, 770 F. Supp. 3d 1279, 1293 (D. Colo. 2025) (holding that officer who did not personally participate in the constitutional violation could not be liable under § 1983). Officer Wilson's motion for summary judgment is granted.

## B. Statute of Limitations

Detective Jackson and Detective Meek argue that any claims that survive qualified immunity are nevertheless time-barred. Dkt. 149 at 23-24; Dkt. 150 at 24-26. They argue that the statute of limitations on Mr. Atchison's § 1983 claims began to run in 1991 when the investigation and prosecution took place. *Id.* Alternatively, they argue that it began to run in 2017 when Mr. Thomas drafted his affidavit stating that his interview and testimony were false. *Id.* Mr. Atchison responds that his claims are not time-barred because the statute of limitations began to run in 2019 when the state court vacated his conviction. Dkt. 170 at 33-34; Dkt. 172 at 34-36.

No. 21-cv-286

To determine when a § 1983 claim accrued, the Court begins by identifying "the specific constitutional right" the plaintiff claims was violated. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations omitted). After identifying the claim, the Court looks to the analogous common law tort to determine the applicable statute of limitations. *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017). Mr. Atchison's fabrication of evidence, *Brady*, and § 1983 malicious prosecution claims arise under the Fourteenth Amendment's Due Process Clause and are most analogous to common-law malicious prosecution claims. A malicious prosecution claim has a statute of limitations of two years that accrues only upon the favorable termination of the challenged criminal proceedings. *See, e.g., McDonough v. Smith*, 588 U.S. 109, 125 (2019); *see also Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994). Mr. Atchison's fabrication of evidence, *Brady*, and § 1983 malicious prosecution claims are timely because they were brought within two years of the court's decision to vacate Mr. Atchison's conviction.

The Court reaches a different conclusion on Mr. Atchison's failure-to-intervene claim. Not all § 1983 claims begin to accrue upon favorable termination of the criminal proceedings. *See, e.g., Wallace v. Kato*, 549 U.S. 384, 394 (2007) (recognizing that some § 1983 claims "accrue before the setting aside of—indeed, even before the existence of—the related criminal conviction"). Mr. Atchison's remaining failure-to-intervene claim against Detective Meek is not attributable to his conviction. Instead, the claim focuses on Detective Meek's alleged observation of the constitutional violations and failure to report them. This claim accrued when Mr. Atchison learned of the alleged coercion and Detective Meek's failure to intervene. *See, e.g., Stewart v. City of Boulder*, No. 1:19-cv-01588-RM-NYW, 2020 WL 5201289, at *3 (D. Colo. Sept. 1, 2020) (adopting magistrate judge's report and recommendation, holding that plaintiff's failure to intervene claim accrued at the time of the alleged constitutional violation because the claim "d[id] not attack the criminal process that resulted in his conviction"); *Thomas v. City of Troy*, 293 F.

No. 21-cv-286

Supp. 3d 282 (N.D.N.Y 2018) ("The statute of limitations for a claim based on failure to intervene accrues when the failure to intervene occurs."), *on reconsideration on other grounds sub nom. Thomas v. Mason*, No. 1:17-cv-626 (DJS), 2019 WL 6111572 (N.D.N.Y. 2019). The violation took place in 1991, and Mr. Atchison learned of it in Mr. Thomas's 2017 affidavit. Either way, Mr. Atchison filed his complaint in 2021, which falls outside the two-year statute of limitations. Mr. Atchison's failure-to-intervene claim is time barred and cannot proceed to trial.

### C. Municipal Liability

The Court turns next to Mr. Atchison's *Monell* claim against the City. To establish municipal liability, a plaintiff must show not only that the employees committed a constitutional violation but also that a policy or custom of the employer was the moving force behind the constitutional deprivations. *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). The City argues that none of its officers committed a constitutional violation. Dkt. 151 at 16-17. But because there is evidence from which a jury could find that the detectives fabricated evidence, committed *Brady* violations, and deprived Mr. Atchison of his liberty without probable cause, *see supra*, Sections III(A)(1)-(3), the Court must determine whether the City had a policy or custom that was the moving force behind these violations.

#### 1. Policies, Practices, and Customs

In the context of a *Monell* claim, a policy or custom can include:

(1) a formal regulation or policy statement;

(2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;

(3) the decisions of employees with final policymaking authority;

26

No. 21-cv-286

    (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or

    (5) the failure to adequately train or supervise employees, so long as the failure results from "deliberate indifference" to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and citations omitted). Under his formal policy theory, Mr. Atchison identifies three City policies that allegedly gave rise to his injuries: (1) conducting unrecorded pre-interviews; (2) affording officers broad discretion on interview techniques; and (3) not requiring the presence of parents for juvenile witnesses.[12] Mr. Atchison has failed to provide evidence upon which a reasonable jury could determine that these policies caused his specific constitutional violations. This lack of evidence is fatal to Mr. Atchison's *Monell* claim.

    In *Bryson v. City of Oklahoma*, the Tenth Circuit addressed similar legal issues: Mr. Bryson was convicted based on false testimony from an Oklahoma City Police Department forensic chemist and brought § 1983 claims against Oklahoma City. 627 F.3d at 787. Mr. Bryson argued that Oklahoma City had a custom of encouraging forensic chemists to manipulate evidence to obtain convictions. *Id.* at 790. In support of his claim, Mr. Bryson pointed to testimony that the forensic chemists would testify "in a way that is the most incriminating" and other statements criticizing the trial testimony. *Id.* The Tenth Circuit granted Oklahoma City's motion for summary judgment on the § 1983 *Monell* claim because, after taking all of the evidence in the light most favorable to Mr. Bryson, it was "not persuaded the evidence [was] sufficient to give rise to an inference of widespread City practice of fabricating

---

    [12] Mr. Atchison does not argue that any of these procedures or policies were used against him directly but instead used against the witnesses that testified against him.

No. 21-cv-286

results and concealing evidence that was 'so permanent and well settled as to constitute a custom or usage with the force of law.' " *Id.* at 791 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Mr. Atchison, like Mr. Bryson, has failed to provide evidence from which a reasonable jury could conclude that the City's policies caused the specific constitutional violations at issue here. The City has presented several legitimate reasons why an officer may have needed to conduct a pre-interview in 1991. Dkt. 190 at 8. This type of policy, by itself, would not require or encourage officers to use the unrecorded portion of the interview to feed witnesses false information or to threaten them. And there is no evidence that officers routinely misused the policy to coerce statements or that the City knew of or encouraged coercion similar to the events that took place in Mr. Atchison's case.

While officers were afforded discretion in how to conduct interviews, the policy in force was "to comply with and follow federal and state law as well as uphold the Constitution." Dkt. 190 at 10. Officers were provided training on the negative effects of threatening witnesses or promising them leniency. Dkt. 151-14 at 10-15. Further, officers were provided with information on how *Miranda* applied to juveniles and the legal requirements for questioning juveniles. *Id.*; Dkt. 151-14 at 121-22. Neither policy identified by Mr. Atchison required or encouraged officers to threaten witnesses with life in prison or the death penalty in any situation. Further, there is no evidence that the City knew of the alleged practice or endorsed it. Viewing the evidence in the light most favorable to Mr. Atchison, he has failed to provide sufficient evidence upon which a reasonable jury could determine that the City had a policy or practice of fabricating evidence and threatening witnesses that was "so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127 (citation omitted).

No. 21-cv-286

## 2. Failure to Train

Mr. Atchison brings another *Monell* claim based on a theory that the City failed to train its officers. Dkt. 176 at 30-36. The City's failure to train or supervise employees is an official policy or custom only when it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). To establish a failure-to-train claim, Mr. Atchison must show: "(1) 'the existence of a [municipal] policy or custom involving deficient training'; (2) an injury caused by the policy that is 'obvious' and 'closely related'; and (3) that the municipality adopted the 'policy or custom with deliberate indifference' to the injury." *Valdez v. Macdonald*, 66 F.4th 796, 816-17 (10th Cir. 2023) (citing *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)). Mr. Atchison argues that the City had deficient or non-existent training on officers' *Brady* obligation to disclose exculpatory and impeachment evidence and how to conduct witness interviews and interrogations. Dkt. 176 at 32.

Mr. Atchison has failed to provide evidence that the City failed to train its officers, and that the deficiencies in its training would have been obvious and closely related to his specific constitutional injuries. At the time of the investigation, Detectives Jackson and Meek had been police officers for over ten years. Dkt. 151-4 at 5.[13] The detectives also testified that the proper interview technique was to ask open-ended questions and that they knew not to

---

[13] When they became police officers, they attended police academy training which focused on criminal justice, state law, federal law, police procedures, constitutional law, TPD's policy manual, firearms, self-defense, active listening, communication, first aid, driving, crime scene investigation, and accident investigation. Dkt. 151-16 at 3. The officers also had extensive on-the-job training. Dkt. 171-9 at 11; Dkt. 171-17 at 46-47. The Supreme Court decided *Brady v. Maryland* in 1963, which would have given police academies over twenty years to incorporate *Brady* requirements into its general training for new officers and on-the-job training by the time Mr. Atchison's violations occurred.

No. 21-cv-286

provide the witness with any information he did not already know. Dkt. 171-9 at 13, 15, 44, 103; Dkt. 171-17 at 65. They also testified that they knew it was important for the district attorney to receive everything from the investigation file. Dkt. 171-9 at 24, 122-23, 138. Although there was no written policy or legal bulletin addressing the specific violations alleged here, the Court cannot say, based on the record, that the officers did not receive training on these issues—particularly given the detectives' testimony that they understood their obligations.

Further, Mr. Atchison does not present any evidence that specific, written training regarding interview techniques or *Brady* obligations was universal across police departments in 1991. *See, e.g., Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010) ("[A]lthough … most forensic laboratories began adopting better training and management practices in the 1970s and 1980s, such practices were by no means universal in 1983, further militating against the conclusion that it was highly predictable or plainly obvious in 1983 that the training and supervision practices employed by the City and other jurisdictions would result in the violation of federal rights."). It is not obvious that additional training, as suggested by Mr. Atchison, would have prevented these officers from feeding false information to witnesses and then failing to disclose that information to the district attorney or defense counsel. Given the evidence of the detectives on-the-job and academy training, Mr. Atchison has failed to show that a written, formal policy on interrogation techniques and *Brady* obligations was obviously necessary at the time to prevent officers from providing false information to witnesses to coerce statements and ignoring *Brady* obligations.

The third element requires Mr. Atchison to provide evidence that the City acted with deliberate indifference to his alleged injuries. The Tenth Circuit recognizes that:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or

No. 21-cv-286

> failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (internal quotation marks and citations omitted).

Mr. Atchison has failed to provide sufficient evidence of a pattern of tortious conduct as required to establish deliberate indifference. The only prior instance Mr. Atchison points to occurred in 1989 when a judge suppressed a statement made by eighteen-year-old LaRoye Hunter during an interview with TPD. Dkt. 176 at 35-36. Mr. Hunter alleged that the officers yelled at him and coerced him into confessing. Dkt. 171-39. Here, Mr. Atchison claims that detectives provided false evidence to witnesses and then coerced false statements to be used at trial. Mr. Hunter's prior allegation that his statement was coerced, not that it was false, would not have put the City on notice that officers were fabricating evidence or ignoring their *Brady* obligations. *See, e.g., Connick*, 563 U.S. at 63 (holding that incidents that are not sufficiently like the violation at issue could not have put the defendant "on notice that specific training was necessary to avoid this constitutional violation"). And even if Mr. Hunter's allegations were sufficiently similar to Mr. Atchison's, the Tenth Circuit has held that "[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Coffey v. McKinley Cty.*, 504 F. App'x 715, 719 (10th Cir. 2012).

No. 21-cv-286

Without a pattern of tortious conduct, Mr. Atchison must instead show that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390. As discussed, both detectives received training and understood proper interrogation techniques and their *Brady* obligations. Mr. Atchison gives no reason why it would be highly predictable or plainly obvious to the City that additional training would be necessary to prevent these detectives from giving witnesses false information, coercing false statements, or failing to turn over exculpatory evidence. *See, e.g., Bryson*, 627 F.3d at 789 ("We are not persuaded … that it was highly predictable or plainly obvious that a forensic chemist would decide to falsify test reports and conceal evidence if she received only nine months of on-the-job training …."). Because Mr. Atchison has failed to provide sufficient evidence from which a reasonable jury could determine that the City had a custom or policy that caused his constitutional violations, the City's motion for summary judgment is granted.

## IV

Mr. Atchison also brought claims under Oklahoma law. He alleges that the officers intentionally inflicted emotional distress, maliciously pursued his prosecution, and acted together in a civil conspiracy. Dkt. 57 at 23-26. He also claims that the City is responsible for the officers' actions under theories of respondeat superior liability and indemnification. *Id.* The officers argue, and Mr. Atchison concedes, that these claims are barred by the Oklahoma Governmental Tort Claims Act. Dkt. 148 at 21; 149 at 25; 150 at 26; 151 at 24-26; 170 at 34 n.10; 172 at 36 n.9; 175 at 21 n.7. Accordingly, Defendants' motions for summary judgment on the state law claims are granted.

## V

The Defendants also seek summary judgment on Mr. Atchison's request for punitive damages. Dkt. 148 at 25-26; Dkt. 149 at 29; Dkt. 150 at 30.

No. 21-cv-286

Under § 1983, punitive damages may be awarded if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Mr. Atchison concedes that his request for punitive damages pertains only to the officers. Dkt. 176 at 36 n.12. The City's motion for summary judgment on the punitive damages claim is granted. Because there is no remaining § 1983 claim against Officer Wilson, his motion for summary judgment is granted. As for Detective Jackson and Detective Meek, intent is a matter best determined by a jury; it cannot be determined on a motion for summary judgment. Accordingly, the detectives' motions for summary judgment on the punitive damages claims are denied.

## VI

Officer Wilson and the City's motions for summary judgment [Dkts. 148, 151] are granted. Detective Jackson and Detective Meek's motions for summary judgment [Dkt. 149, 150] are granted on Mr. Atchison's failure to intervene, conspiracy, and state law claims; they are denied on Mr. Atchison's §1983 claims based on fabrication of evidence, *Brady* violations, and malicious prosecution. The parties' pending motions to exclude expert opinions [Dkts. 141, 145] are denied without prejudice; the parties have thirty days from the issuance of this order to amend their expert reports consistent with these rulings, and the parties will then have thirty days to refile any necessary motions to exclude.

DATED this 25th day of August 2025.

JOHN D. RUSSELL
*United States District Judge*